UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CINDY MCGOUGH, as Personal
Representative of the Estate of Herman B.
Tucker, deceased,

                Plaintiff,

-vs-                                     Case No.  5:06-cv-364-Oc-10GRJ

MARION COUNTY, ED DEAN, individually
and in his official capacity as Sheriff of
Marion County, FRED LATORRE,
individually and in his official capacity,
PAUL LAXTON, individually and in his
official capacity, KEVIN DAHMEN,
individually and in his official capacity,
PRISON HEALTH SERVICES, a foreign
corporation, JOHNNIE GALLEMORE,
DENISE FOX, DANA EWELL, ANTENEH
ADDISU, AARON SCROGGINS, and
ALBERT WILLISON,

                Defendants.

_____

## O R D E R

      This case stems from the death of Herman B. Tucker while he was housed as a

pretrial detainee at the Marion County Jail.  The Plaintiff, Cindy McGough, acting in her role

as personal representative of Tucker's Estate, has filed suit against Marion County, Sheriff

Ed Dean, two Marion County corrections officers, Prison Health Services, ("PHS"), the

acting director of the Marion-Citrus Mental Health Center, and six PHS employees.  The

Complaint, now in its third iteration, alleges twenty state law and federal civil rights claims

against the Defendants, all of which center around the treatment Tucker received while at the County Jail.

Following the conclusion of discovery, the Plaintiff voluntarily dismissed her claims against Defendants Marion County, Kevin Dahmen, Johnnie Gallemore, Denise Fox, Dana Ewell, Anteneh Addisu, Aaron Scroggins, and Albert Willison, (Docs. 113, 115, 117), leaving only her state and federal claims against Defendants Dean, corrections officers LaTorre and Laxton, and PHS.  These remaining Defendants have all filed motions to dismiss, (Docs. 44, 52), as well as motions for summary judgment.  (Docs.116, 119).  The Plaintiff has filed a response in opposition to these motions, (Docs. 54, 59, 147), as well as a motion for partial summary judgment, (Doc. 118), to which the Defendants have responded.  (Docs. 127, 144).  Because the arguments raised in these motions overlap in large part, the Court will focus primarily on the motions for summary judgment, and only consider any additional arguments raised in the motions to dismiss where necessary.

Upon careful consideration of the record as a whole, including the oral argument heard on May 8, 2008, the Court concludes the Defendants are entitled to summary judgment in their favor on the Plaintiff's federal civil rights claims brought under 42 U.S.C. § 1983, and the state law Baker Act claims.  The Court further concludes that the Plaintiff's motion for partial summary judgment is due to be denied, and that this case may proceed against Defendant Dean on the state common law survival action, as well as on the claims for negligence and wrongful death.

## STATEMENT OF UNDISPUTED FACTS

The record reveals the following material, undisputed facts, taken in the light most favorable to the Plaintiff.

I.    Herman Tucker's Arrest

At the time of his death, Herman Tucker was a 24-year old male residing in Citrus County, Florida.  Tucker had a long history of mental illness and suffered from various conditions including fetal alcohol syndrome, paranoid schizophrenia, and autism disorders. Tucker was placed in the state foster care system at the age of 3, and spent several years in and out of treatment facilities, both as a child and as an adult.

In early August 2002, Tucker was released from state prison after completing a seven year term of imprisonment for kidnaping, false imprisonment and battery on a law enforcement officer.  He moved in with his mother, Carolyn Tucker, upon his release.  On August 10, 2002, Tucker's mother called the Citrus County Sheriff's Office and asked them to arrest Herman Tucker and transport him to a mental health facility for examination and treatment under the provisions of Florida's Mental Health Act, Fla. Stat. §§ 394.451, *et seq.*, (the "Baker Act").  According to his mother, Tucker was delusional and threatening to kill himself.[1]

The Citrus County Sheriff's Deputies who responded to Ms. Tucker's call determined that Herman Tucker was a danger to himself and others, and that he met the criteria for

---

[1]There is some evidence that at the time of his arrest, Tucker had been drinking alcohol and smoking cigarettes laced with LSD.

involuntary examination and commitment under § 394.463 of the Baker Act.  The officers transported Tucker to the Marion-Citrus Mental Health Center - the designated mental health receiving  facility for Marion and Citrus Counties - for an initial 72 hour involuntary commitment assessment and treatment period.[2]   See Fla. Stat. §§ 394.455(26); 394.463(2)(a)2.

Upon his arrival at the Center, Tucker met with former Defendant Kevin Dahmen, the acting director of the Center, for an initial evaluation.  Dahmen prescribed for Tucker 4 milligrams of Ativan, 100 milligrams of Benadryl, and 20 milligrams of Haldol.[3]  Before Dahmen could complete his examination, however, Tucker attacked and bit Dahmen.  As a result of the attack, the Marion County Sheriff's Office was contacted, and Tucker was arrested, charged with felony battery on an emergency care provider, and transported to the Marion County Jail for treatment and detention.[4]

Tucker arrived at the Marion County Jail on August 10, 2002. At that time, Defendant PHS was under contract with the Marion County Sheriff's Office to provide medical services

---

[2]A "receiving facility" is defined under the Baker Act as "any public or private facility designated by the [Florida Department of Children and Family Services] to receive and hold involuntary patients under emergency conditions or for psychiatric evaluation and to provide short-term treatment.  The term does not include a county jail."  Fla. Stat. § 394.455(26).  There is no dispute that Marion-Citrus Mental Health Center is a designated "receiving facility."

[3]The combination of Ativan and Haldol is frequently used to sedate highly agitated or violent persons, and Benadryl is administered at the same time to counteract any potential side effects of the other two psychiatric drugs, including tremors.

[4]It is unclear who contacted the Marion County Sheriff's Office; however, there is no dispute that the Marion County Sheriff's Office had jurisdiction over Tucker because the Marion-Citrus Mental Health Center is located in Marion County, Florida.

4

to inmates at the Marion County Jail, and was the entity with the authority to determine whether inmates with medical conditions were placed in the infirmary, in the regular jail population, received medications, or were subject to any other special medical treatment. At all relevant times, Defendants Fred LaTorre and Paul Laxton were in charge of the day-to-day operations of the Marion County Jail: Defendant LaTorre in his role as Corrections Bureau Chief, and Laxton in his role as Assistant Corrections Bureau Chief. Defendant Ed Dean, in his role as Marion County Sheriff, had ultimate responsibility and authority over the operation of the Marion County Jail.

Dean and LaTorre never had any direct, personal contact with Tucker, nor did they personally participate in any capacity in any decisions involving Tucker's inmate classification, discipline, or medical treatment while at the Marion County Jail.  Laxton had some limited personal contact with Tucker at the Jail; he was aware of the fact that Tucker had behavioral and mental problems, and that Tucker had been placed on suicide watch. Laxton was also aware that Tucker died while detained at the Marion County Jail from choking on his food.  With one exception, Laxton did not personally participate in any capacity in any decision involving Tucker's inmate classification, discipline, or medical treatment while at the Jail.[5]

_____

[5]On August 22, 2002, Laxton signed off on a special management meal report, which placed Tucker on a special management meal (a meat loaf style food).  It is unclear from the record how long Tucker was placed on special management meals.

II.   Tucker's Treatment At The Marion County Jail.

Throughout Tucker's stay at the Marion County Jail - just over a month - he exhibited violent and aggressive behavior, and often acted in an altered and delusional manner.  He received medical treatment at the Jail from several PHS nurses and physicians, including a psychiatrist, and his condition was assessed on a daily basis.

Tucker's medical treatment began on August 11, 2002, the day after he arrived at the Jail.  On that day, one of PHS's licensed practical nurses completed a screening physical examination of Tucker.  During the examination the nurse noted that Tucker had a large contusion at the mid occipital base of the skull, swelling of the right eye and copious swelling to the center of his forehead and cheek area.  Tucker also complained of a headache, blurred vision and dizziness.  Based on Tucker's medical condition and the fact that he had recently been involved in an altercation at the Marion-Citrus Mental Health Center, PHS staff sent Tucker to Munroe Regional Medical Center (a large hospital) for further treatment.

Tucker arrived at Munroe Regional at 1:57 p.m. on August 11, 2002, where he was given a complete physical examination, including a CT brain scan and chest x-ray.  He was found to have no physical abnormalities, but did have suicidal thoughts and suffered from some sort of psychosis.  Nevertheless, Munroe Regional discharged Tucker within a few hours and returned him to the custody of the Marion County Jail.

Tucker returned to the Jail in the late afternoon on August 11, 2002, and underwent another screening physical and mental health evaluation at 6:00 p.m.  The screening and

6

evaluation were conducted by PHS licensed health personnel.   The record of that examination lists the following pertinent details:   Tucker had normal vital signs, but had several scars from previous suicide attempts. Tucker complained of headaches, blackouts, blurred vision and dizziness, and he stated that he had trouble swallowing.[6]   He also claimed to have tuberculosis, HIV, and that he was in remission from testicular cancer. Tucker stated that he had used alcohol in the past, and had been taking 100 milligrams of the antidepressant Sinequan, but could not remember the last time he ingested either the medication or any alcohol.   Throughout the examination, Tucker was very withdrawn, agitated, drowsy, disoriented, and unable to answer questions appropriately.   He would also  curl up into the fetal position.   Based on this examination, PHS placed Tucker in the infirmary under suicide watch precautions.[7]

On August 12, 2002, Tucker complained of chest pain.   Former Defendant Anteneh Addisu, one of PHS' physicians, ordered an EKG and evaluated Tucker.   Addisu then prescribed the medications Phenergan and Zantac.   At 2 p.m. on August 12th, former Defendant Johnnie Gallemore, a psychiatrist for PHS, evaluated Tucker and diagnosed him with a behavioral disturbance of undetermined etiology.   Gallemore ordered that Tucker remain on suicide watch precautions and close observation.   Gallemore also directed that

---

[6]There is also evidence that Tucker would shake and suffered from tremors during his entire detention at the Marion County Jail.

[7]As discussed in more detail below, suicide watch precautions require constant observation by either medical or corrections personnel and visual checks every 15 minutes.

Tucker return to Monroe Regional Medical Center for further examination of his continued complaints of chest pain.

Tucker arrived at Monroe Regional that same day, August 12, and underwent another physical examination.  Several lab tests were conducted, as well as another EKG. Tucker remained at the hospital overnight and was returned to the Marion County Jail's infirmary on the evening of August 13, 2002.  At that time, Defendant Dana Ewell, a PHS registered nurse, completed a mental health examination of Tucker and determined that Tucker could be released from suicide watch precautions.  However, it does not appear that Tucker left the infirmary at that time.

On August 14, 2002, Dr. Addisu met with Tucker on two separate occasions and spoke with Tucker's mother regarding Tucker's health and prior treatment.  Ms. Tucker informed Dr. Addisu that Tucker had been on numerous psychiatric medications throughout his life and that he was allergic to Thorazine.  Dr. Addisu diagnosed Tucker as having a probable underlying psychotic disorder and prescribed Librium.  On August 14, 2002, while under close observation at the infirmary, Tucker refused his medications, and exhibited an altered mental status.  Around 4 p.m. that day, Tucker became very agitated and aggressive - he repeatedly yelled and banged on the infirmary door and screamed "you're trying to kill me." To protect Tucker from harming himself, corrections officers placed Tucker in a restraint chair for just under four (4) hours, until he calmed down.  He was released without further incident and monitored in the infirmary the rest of the day.

8

Former Defendant Albert Willison, a PHS nurse practitioner, conducted another assessment of Tucker in the infirmary on August 15, 2002.  During this examination, Tucker was much calmer and able to express his thoughts more clearly.  He explained to Willison that he had a long history of mental illness and had been on numerous medications.  Tucker also told Willison that he often heard voices, and that he took alcohol with his medications at times.  Tucker then denied any suicidal ideation and expressed remorse for threatening to kill himself on earlier occasions.  Based on this meeting, Willison determined that Tucker most likely suffered from paranoid schizophrenia, and that some of Tucker's symptoms may have been alcohol induced.  Willison then ordered that Tucker continue to be monitored in the infirmary and that he receive 40 milligrams of Geodon two times per day.[8]

Dr. Addisu also saw Tucker on August 15th, and agreed that Tucker probably suffered from schizophrenia.  On August 16, 2002, Dr. Addisu again evaluated Tucker and determined that Tucker could be released from the infirmary to the stepdown unit, which is located in A-Pod, part of the general population section of the Marion County Jail.  It appears that at all relevant times, Tucker had his own cell in A-Pod.

While in A-Pod, Tucker continued to be disruptive and exhibit aggressive and disturbing behaviors, as well as an altered mental state.  As a result, Tucker was constantly

---

[8]Geodon is an anti-psychotic drug that is prescribed to reduce the symptoms of schizophrenia and to treat manic episodes.  Tucker's medical records state that he began receiving Geodon as prescribed on August 15, 2002.

monitored by PHS psychiatric nurses.  On August 16, 2002, after Dr. Addisu released

Tucker to A-Pod, PHS staff obtained an Emergency Treatment Order and sedated Tucker

with an injection of Ativan, Benadryl and Haldol.[9]  PHS also drew blood from Tucker, which

was sent to Monroe Regional for various lab tests.  On August 17, 2002, Tucker became

aggressive and violent, and corrections officers placed Tucker in a restraint chair for

approximately one hour until he calmed down.  On August 18, 2002, Tucker exhibited

aggressive and violent behavior, verbalized paranoid delusions, and was disoriented.  He

was placed in the restraint chair several times that day, for a total of just under eight (8)

hours.  Dr. Addisu and Nurse Willison also signed an Emergency Treatment Order to inject

Tucker with 5 milligrams of Haldol, 50 milligrams of Benadryl, and 2 milligrams of Ativan.

Tucker was placed back on suicide watch precautions, although he was not returned to the

infirmary.

Tucker's aggressive behavior continued.  On August 19, 2002, he was placed in a

restraint chair on two separate occasions for a total of approximately five (5) hours.  Nurse

Willison also prescribed another dosage of Haldol, Benadryl and Ativan.  Dr. Addisu

examined Tucker on August 19th, and noted that Tucker was agitated and talking in an

---

[9]Emergency Treatment Orders involving anti-psychotic drugs are used by PHS and officers at the Marion County Jail in order to sedate and/or control inmates who have been diagnosed with psychiatric disorders and engage in violent behavior which is harmful to themselves or others. Although the Plaintiff contends that these orders were used to quiet Tucker when he was merely being disruptive, there is no evidence to support that contention.  Rather, all of the records before the Court demonstrate that he was administered anti-psychotic drugs at times when he was being violent to himself and/or others.

incoherent manner.  Dr. Addisu's medical records reflect that Tucker was most likely schizophrenic, and that Geodon should continue to be administered.  Dr. Addisu also ordered follow up lab tests and blood pressure checks, and reviewed Tucker's prior chest x-ray and CT scan from Monroe Regional, which were normal.  Nurse Ewell also met with Tucker in the evening of August 19th, and determined that Tucker should remain on suicide watch precautions.

On August 20, 2002, Dr. Gallemore met with Tucker in the morning.  Tucker was alert and engaged and in no obvious distress.  His responses to questions were deliberate and generally appropriate, and he was able to recall recent events, including an extensive history of drug and alcohol abuse.  Dr. Gallemore also talked at length with Tucker's mother, who provided more details about Tucker's history in the foster care system and past incarceration, his prior treatment  and medications, and her opinion that none of the medications had helped her son.  Based on this information and his own assessment of Tucker, Dr. Gallemore concluded that Tucker suffered from alcohol and polysubstance abuse, psychosis of undetermined etiology, and probable personality disorder.   Dr. Gallemore directed that anti-psychotic medications be continued and that Tucker remain on suicide watch precautions.

Between August 20, 2002 and September 15, 2002, Tucker was assessed daily by one of PHS' psychiatric nurses to determine whether Tucker should remain on suicide watch precautions.  Tucker frequently made statements that he was going to kill himself; thus, with the exception of one day - August 21, 2002 - Tucker remained on suicide watch

11

precautions throughout the remainder of his detention.  Tucker's violent and disruptive behavior also continued during this time, although his behavior slightly improved towards the end of his stay.[10]  Corrections officers at the Marion County Jail placed Tucker in a restraint chair for approximately five (5) hours on August 22, three (3) hours on August 23, 2002, five (5) hours on August 25, 2002, four and one-half (4.5) hours on August 27, 2002, two (2) hours on August 29, 2002, four  (4) hours on September 4, 2002,[11] and four (4) hours on September 8, 2002.   Tucker received another Emergency Treatment Order of Haldol, Ativan, and Benadryl on August 22, 2002 and again on August 26, 2002, and was pepper sprayed on August 23, 2002 and September 13, 2002.[12]

During the time Tucker was detained at the Marion County Jail, corrections officers were also attempting to schedule an examination for Tucker at the Jail by an outside psychiatrist.  On numerous occasions between August 20, 2002 and September 14, 2002, officers contacted both the state prosecutor's office and the state public defender's office

---

[10]Tucker's violent behavior resulted in the revocation of his bond and at least two more felony charges against him for battery on law enforcement officers.

[11]On September 4, 2002, PHS registered nurse L.  Kelly checked on Tucker while he was in the restraint chair and spoke with Sargeant Chapman, the officer on duty, about transferring Tucker back to the infirmary.  Once Tucker calmed down, Chapman decided to keep Tucker under suicide watch in A-Pod.

[12]On at least one occasion, officers used an air taser on Tucker and sprayed him with pepper foam, a derivative of pepper spray.  The Plaintiff contends that Tucker was also beaten and taunted by corrections officers and inmates during his stay, but the evidence is in dispute as to those events.

in order to set up the examination.  A psychiatrist was eventually scheduled to meet with Tucker on Monday September 16, 2002.

At approximately 12:25 p.m. on Sunday, September 15, 2002, while Tucker was still on suicide watch precautions, Officer McCall noticed that Tucker was lying on the floor of his cell not moving.  PHS employees responded immediately and began treatment, including CPR.  Emergency Medical Services also arrived on the scene and attempted to revive Tucker.  It quickly became apparent that something was blocking Tucker's airway, and PHS and EMS personnel removed large, thumb-sized pieces of food from Tucker's throat using forceps.  Efforts to revive Tucker were ultimately unsuccessful, and Tucker was pronounced dead at 12:50 p.m.  The Marion County Medical Examiner, Dr.  Julia Martin, determined that Tucker had a large amount of food lodged in his throat, and that he died from "aspiration of a food bolus" - he choked to death on his lunch meal.[13]

III.    Relevant Policies and Procedures

At the time of Tucker's detention, the Marion County Sheriff's Office operated under several Operational Directives (in house policies adopted and put in place by the Sheriff) which governed the manner in which persons who are perceived to suffer from a mental disability were to be treated.  Many of these Directives track closely the provisions of the Baker Act.  For example, Operational Directive 4071.00, entitled "Baker Act Procedures,"

_____

[13]A "food bolus" is simply a large amount of solid food.  While Dr.  Martin found no evidence of suicide, at least one of the Plaintiff's expert witnesses believes that Tucker committed suicide by deliberately choking on his lunch.

provides that the Marion County Sheriff's Office will respect the individual dignity of persons suffering from mental illness at all times, including when such persons are taken into custody, detained, or transported.  Directive 4071.00 mandates that the Sheriff's Office transport persons with mental illnesses to the Marion-Citrus Mental Health Center after receiving a court order or a certificate of involuntary examination by a physician.  The Directive does not list any other designated receiving facility, and expressly states that once the Marion County Sheriff's Office delivers the person to the Marion-Citrus Mental Health Center, the Sheriff's Office's "statutory requirement has been met."  The Directive also does not require that the Sheriff's Office locate any other receiving facility or transport persons who are released from the Marion-Citrus Mental Health Center to any other facility.

Operational Directive 4071.10, entitled "Procedures For Handling Mentally Ill Persons," mandates that "procedures, facilities, vehicles, and restraint devices utilized for criminals or those accused of crime shall not be used in connection with the non-criminal mentally ill except for the protection of patients or others."  Directive 4071.10 further provides that the "non-criminal mentally ill shall not be detained or incarcerated in the Marion County Jail," and sets forth the procedures for both voluntary and involuntary admission to the Marion-Citrus Mental Health Center.  However, these admission procedures apply to an initial arrest; there is nothing in the Directive specifying that once a person is arrested and transported to the Center, that the Sheriff's Office must then find a substitute facility for the person if he is arrested and charged with a crime.  In fact, Directive 4071.10 states that "[o]n arrival at the receiving facility the deputy's duty is

14

concluded by the delivery of the patient and completion of the report of the law enforcement officer."

Lastly, Operational Directive 4071.20, entitled "Criminally Charged," requires that persons who are arrested for either non-criminal or minor criminal infractions and meet the conditions for involuntary admission to a receiving facility are to be taken directly to the receiving facility for examination.  Persons who are arrested for felony criminal behavior, however, are first processed in the same manner as any other criminal suspect, and then taken to the receiving facility.  The receiving facility is not required to admit anyone who is charged with a crime if the facility determines it cannot provide adequate security.  Instead, the receiving facility will treat such persons at the place where he or she is detained.

The Marion County Sheriff's Office also has in place several Operational Directives establishing the policies and procedures for providing mental health care to pretrial detainees and inmates.  Operational Directive 6540.00 states that it is the policy of the Sheriff's Office to ensure the physical and mental well being of all inmates incarcerated at the Marion County Jail, and requires that the Sheriff's Office provide medical, dental, mental, and related health care services.  Directive 6540.10 mandates that the Sheriff's Office contract with a private organization to provide, among other services, a mental health program for the evaluation, treatment, and/or referral of inmates.

With respect to the Jail itself, Operational Directive 6766.00 provides procedures for segregating inmates in order to ensure their safety and the smooth operation of the Jail. Inmates such as drug addicts and abusers, the emotionally disturbed,  the mentally ill, and

those who present a high risk to themselves or others are classified as "Special Needs Inmates,"and are provided individual cells when possible and appropriate.  Operational Directive 6011.00 provides that inmates must be visually observed every hour, and inmates who are violent, mentally disordered, or demonstrate bizarre behavior are to be observed as frequently as possible.  Suicidal inmates, however, must be continually observed, and annotations must be made on a "confinement log" every 15 minutes.[14]

Operational Directive 6541.00 sets forth the policy of the Sheriff's Office to screen and observe inmates for suicidal tendencies, to intervene to prevent suicide attempts, and to train correctional officers to recognize and prevent suicide attempts.  If, during the booking process, it is determined that an inmate was previously incarcerated and had suicidal tendencies, the inmate will be taken to the infirmary and placed on suicide watch precautions until he is checked by a PHS mental health employee.  Suicide watch precautions include constant supervision of the inmate in the infirmary, removal of all items that could be used by the inmate to injure himself, and visual checks of the inmate every 15 minutes.  An inmate may be released from the infirmary, but only after he is seen by the Jail mental health counselor or psychiatrist to determine the inmate's level of suicide risk.

## PROCEDURAL HISTORY

The Plaintiff is Tucker's half-sister and the personal representative of his estate.  On September 15, 2006, precisely four years from the date of Tucker's death, the Plaintiff filed

---

[14]See Operational Directive 6011.00(B).

her original complaint in state court.  On October 3, 2006, Defendants Dean, LaTorre and Laxton removed the case to this Court.  (Doc. 1).   The Plaintiff, with leave of Court, Amended her complaint on January 5, 2007,  and again on January 29, 2007.  (Docs.  35, 50).  The most current version, the Second Amended Complaint, sets forth twenty claims against the Defendants alleging violations of Tuckers' Fourth and Fourteenth Amendment rights, violations of the Baker Act, as well as state common law claims for negligence, wrongful death, and a survival action.

In December 2007, the Plaintiff voluntarily dismissed her claims against all Defendants except for PHS, Dean, LaTorre, and Laxton.  Therefore, the only claims remaining are:  (1) claims under 42 U.S.C. § 1983 against Dean, LaTorre, Laxton, and PHS for violations of Tucker's rights under the Fourth and Fourteenth Amendments (Counts III, X-XI, XIV); (2) claims against Dean, LaTorre and Laxton for alleged Baker Act violations (Counts IV, VIII-IX); and (3) state law claims for negligence, wrongful death, and a survival action against Dean (Counts V-VII).  Defendants Dean, LaTorre, and Laxton have been sued in both their individual and official capacities.  The Plaintiff seeks declaratory and injunctive relief against each Defendant, as well as compensatory damages, attorneys' fees, and costs.

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."  In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party."  Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."  Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.

## DISCUSSION

I.     Individual Capacity Claims Under 42 U.S.C. § 1983

The Plaintiff has asserted four federal tort claims against the remaining Defendants in their individual capacities pursuant to 42 U.S.C. § 1983, alleging that they were deliberately indifferent to Tucker's serious medical needs in violation of his Fourth and Fourteenth Amendment rights.[15]  In essence, the Plaintiff contends that these Defendants

---

[15]The Due Process Clause of the Fourteenth Amendment guarantees pretrial detainees the right to basic necessities that the Eighth Amendment guarantees convicted persons.  Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir.2005) (quoting (continued...)

deliberately ignored and failed to provide appropriate medical treatment for Tucker's mental conditions and suicidal tendencies, as well as for his difficulty swallowing, and instead disciplined and restrained him in a manner that worsened Tucker's medical conditions. The Plaintiff has sued each Defendant in their role as a supervisor and/or employer of the officers and employees who actually disciplined Tucker and  provided (or allegedly failed to provide) Tucker with medical and psychiatric care; the Plaintiff has not alleged that any of the Defendants personally treated or failed to treat Tucker.

Proof of a constitutional tort requires proof of intentional conduct by a state actor; negligence or vicarious responsibility is insufficient.  "The standard by which a supervisor is held liable in [his or her] individual capacity for the actions of a subordinate is extremely rigorous."  Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003) (internal quotation and citation omitted).  Supervisor individual capacity claims under 42 U.S.C. § 1983 cannot be based on a theory of vicarious liability and/or respondeat superior.  Rather, a plaintiff must prove that the defendant supervisors personally participated in the actions complained of. Kentucky v. Graham, 473 U.S. 159, 163-67 (1985).  "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."  West v. Tillman, 496 F.3d 1321, 1328 (11th Cir. 2007) (quoting Cottone v. Jenne, 326 F.3d 1352, 1360

---

[15](...continued)
Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir.1994)).  This includes the right to basic medical care, as well as psychiatric and psychological care.  See Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994).

(11th Cir. 2003)).  Therefore, Defendants Dean, LaTorre, Laxton and PHS can be held liable "only if they personally participated in the allegedly unconstitutional conduct, or if there is a 'causal connection between [their] actions . . . and the alleged unconstitutional deprivation.'"  Id. (quoting Cottone, 326 F.3d at 1360).

### A.    Personal Participation

Even though her Second Amended Complaint is devoid of any allegations that Dean, LaTorre, Laxton, or PHS personally treated and/or disciplined Tucker, or were personally involved in any treatment or disciplinary decisions involving Tucker, the Plaintiff argues in her moving papers that the Defendants violated Tucker's constitutional rights by: (1) deliberately ignoring his suicidal tendencies and his difficulty swallowing; (2) refusing to provide medical and psychiatric treatment; and (3) disciplining and restraining Tucker in a manner that only exacerbated his serious medical conditions.  The record evidence simply does not create any genuine issue of fact that would support such a claim.

The Plaintiff has not presented any evidence that Dean or LaTorre were even aware of Tucker's existence, much less that they were personally and directly involved in any treatment or disciplinary decisions during Tucker's detention at the Marion County Jail.[16] With respect to Laxton, while there is some evidence demonstrating that he was aware of

---

[16]At oral argument, counsel for the Plaintiff could not point to any personal involvement on the part of Dean and admitted that this was the weakest part of the case.  Counsel for the Plaintiff attempted to create personal liability on the part of LaTorre by alleging that LaTorre had received numerous reports concerning Tucker's condition and treatment, and that LaTorre ignored them. However, the Plaintiff has not presented any record evidence to support this allegation.

Tucker's existence, there is a complete absence of any evidence that Laxton was personally involved in any way with any of the medical treatment or disciplinary decisions, save for the decision to place Tucker on meal management, and the Plaintiff has not established that placing Tucker on meal management either deprived Tucker of any constitutional right, or contributed to his death.[17]

For the same reasons, the Plaintiff's claim against PHS in its individual capacity fails. The Plaintiff has not established - nor has she presented any legal authority to support - her claim that the corporate entity PHS itself should be held directly liable for the acts of its employees.  There is no evidence that any corporate officer of PHS - or anyone else with the ability to act on behalf of PHS itself - deliberately ignored Tucker's serious medical needs.[18]

B.   Causal Connection

Because the Plaintiff cannot establish - or create any genuine issue of material fact - that the Defendants personally participated in any of Tucker's medical or disciplinary treatment, the only way the Plaintiff's individual capacity claims can survive summary judgment is if she proves that a "causal connection" exists between the actions of the

_____

[17]The Plaintiff's moving papers do not aid her cause.  They are replete with references to Jail and PHS "personnel" but do not, at any point, refer to any specific act undertaken by any of the remaining Defendants.

[18]To the contrary, the relevant legal authority treats PHS, an entity that has contracted with a state agency to perform a function traditionally within the exclusive prerogative of the state, as a municipality that is not subject to respondeat superior liability.  Buckner v. Toro, 116 F.3d 450, 452-53 (11th Cir. 2007); Ancata, 769 F.2d at 705.

Defendants and the alleged unconstitutional deprivations.   To do so, the Plaintiff must present sufficient evidence of either (1) a "custom or policy [that] result[s] in deliberate indifference to constitutional rights . . . facts [that] support an inference that the supervisor[s] directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so;" or (2) "a history of widespread abuse [that] put the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so."  Cottone, 326 F.3d at 1360.  Again, the Plaintiff has failed to meet her burden.

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997).  A custom "is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law."  Goebert v. Lee County, 510 F.3d 1312, 1332 (11th Cir. 2007).  In order to demonstrate a policy or custom, the plaintiff must "show a persistent and wide-spread practice."  Depew v. City of St. Mary's, Ga., 787 F.2d 1496, 1499 (11th Cir. 1986). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated ocurrences."  West, 496 F.3d at 1328-29 (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal citations omitted)).

The Plaintiff has alleged the existence of two policies or customs: (1) that Dean, LaTorre and Laxton operated under a policy and custom of refusing to transfer mentally ill

22

pretrial detainees who are arrested at the Marion-Citrus Mental Health Center to other appropriate mental health facilities; and (2) that all of the Defendants operated under a policy and custom of refusing to "cure" pretrial detainees, but instead administered anti-psychiatric drugs for the sole purpose of restraining inmates and controlling disruptive behavior.[19]    However, the Plaintiff has not presented any evidence establishing the existence of such policies or customs.   Not only are there no affirmative policies or directives mandating the conduct the Plaintiff alleges, but there is also no pattern of "widespread abuse" - there is no evidence that the Defendants routinely refuse to transfer inmates and detainees to mental health facilities.   All the Plaintiff has proven is that the witnesses deposed during discovery were unaware of whether or not mentally ill inmates and detainees were transferred to mental health facilities, and that it is the stated policy of the Marion-Citrus Mental Health Center to not accept persons who are charged with violent felonies.   This is not sufficient evidence to establish a pattern of "widespread abuse."   More importantly, the Plaintiff has not even presented any legal authority to support her claim that such a transfer under the circumstances of this case is required under any federal or constitutional right, or that an appropriate alternative receiving facility even exists.

The Plaintiff has also failed to make her case with respect to the second alleged policy and custom - that of providing anti-psychotic drugs for the purpose of restraining disruptive inmates as opposed to treating them - because she has not presented any

---

[19]Second Amended Complaint, ¶¶ 19-20, (Doc. 50); see also Plaintiff's Motion for Partial Summary Judgment, pp. 1-2 (Doc. 118).

evidence that such a policy or custom exists.[20]  To the contrary, the evidence before the Court demonstrates that the only times Tucker was given any anti-psychotic drugs were in emergency situations where Tucker was engaging in psychotic and violent behavior. The evidence also establishes that PHS administered Geodon to Tucker throughout his detention as part of a treatment program, not as method of controlling his behavior.[21]  The Plaintiff has also failed to present any evidence that any other inmate at the Marion County Jail had ever received anti-psychotic drugs for the sole purpose of controlling behavior in a non-emergency situation.[22]  Again, all the Plaintiff has established is that the Jail and PHS have policies in place to sedate and/or control inmates and detainees in emergency situations when they are being harmful to themselves or others - she has not pointed to a single situation were such tactics were used merely to quiet a noisy or disruptive inmate,

---

[20]The Plaintiff attempts to create a right under Washington v. Harper, 494 U.S. 210 (1990), by arguing that the Defendants administered anti-psychotic drugs without first obtaining Tucker's informed consent, and without first having a mental health professional assess Tucker's then-current mental status.  The Plaintiff, however, ignores the fact that Geodon was prescribed only after Tucker was assessed by Drs. Addisu and Gallemore, as well as Nurse Willison, and that Haldol, Ativan, and Benadryl were given to Tucker only during a few emergency situations when Tucker was agitated and a danger to himself or others.  In such situations, informed consent is not necessary or even possible, and does not violate an inmate's due process rights.  Washington, 494 U.S. at 227.  See also Deposition of Barry M. Crown, pp. 66-67 (Doc. 121) ("[Y]ou can't get informed consent from an individual who is significantly agitated and disturbed.").

[21]The Plaintiff's own expert witness, Dr. Elias Sarkis, testified that administering Geodon was appropriate medical treatment, and did not believe that Dr. Gallemore deviated from the standard of care.  See Sarkis Depo., pp. 7-8, 28, 65.

[22]The Plaintiff also appears to be arguing that the Defendants have a policy of utilizing pepper spray and the restraint chair to control and/or punish mentally ill inmates for disruptive behavior.  Again, the Plaintiff has not presented any evidence - either as to Tucker individually or as to any other inmate - that such a policy or custom in fact exists.

or to punish an inmate's or detainee's insubordination.  See McDowell v. Brown, 392 F.3d

1283, 1290-91 (11th Cir. 2004) (random acts or isolated incidents are not sufficient to show

a "persistent" or widespread" policy or custom).  See also Goebert, 510 F.3d at 1332

(finding no supervisory liability where no evidence of a widespread policy or custom); Gray

ex rel. Alexander v. Bostic, 458 F.3d 1295, 1308 (11th Cir. 2006) (to establish supervisory

liability, constitutional deprivations must be "obvious, flagrant, rampant and of continued

duration.") (internal quotation and citation omitted).

Nor has the Plaintiff submitted any facts which could support an inference that the

Defendants directed their subordinates to act unlawfully, or that the Defendants knew that

their subordinates would act unlawfully and failed to stop them from doing so.  There is

simply no evidence that Dean, LaTorre, Laxton, or PHS itself directed any of its officers or

employees to withhold treatment for Tucker, or that they were aware of any failure to treat

Tucker.[23]  To be sure, Laxton was aware of Tucker's suicidal tendencies, but there is no

evidence that he knew anyone at the Jail was deliberately refusing to treat Tucker's mental

conditions, that Tucker was not receiving adequate treatment, or that anyone was

deliberately attempting to exacerbate Tucker's mental status. And, to the extent the Plaintiff

seeks to focus on Tucker's alleged difficulty swallowing, she has presented no evidence

_____

[23]Sargent Chapman testified at his deposition that he occasionally spoke with Laxton about Tucker's behavior, as well as the use of pepper spray and the restraint chair.  However, all of these discussions occurred after the fact, and there is no evidence that Chapman ever asked Laxton's permission, or that Laxton was aware that pepper spray or any other restraints were being used for any reason other than to control Tucker during a time when he was being physically violent and aggressive.

that any remaining Defendant was either aware of any such condition, or that the remaining Defendants knew their subordinates were treating Tucker in such a way as to exacerbate his swallowing problems.

Instead, all of the evidence before the Court shows without genuine dispute of material fact that the Defendants followed an extensive set of policies and Operational Directives for treating Tucker and all other mentally ill inmates while detained at the Marion County Jail.  These Operational Directives track the language of the Baker Act almost verbatim, they do not deny Tucker or any other mentally ill inmate any constitutional rights, and there is no evidence that the Defendants deviated from these Directives in any material way.[24]  Moreover, there is a complete absence of any evidence connecting the usage of these Operational Directives or any PHS internal policies with Tucker's death, regardless of whether it was accidental or suicide.  See Cagle v. Sutherland, 334 F.3d 980, 986 (11th Cir. 2003).[25]

Throughout her moving papers and again at oral argument, the Plaintiff has relied on Ancata v. Prison Health Services, 769 F.2d 700 (11th Cir. 1985) in support of her claim

---

[24]The Plaintiff argues that the Defendants violated the Directives when they removed Tucker from the infirmary and placed him on suicide watch precautions in A-Pod.  However, there is no dispute that the entire time Tucker was on suicide watch, he was constantly observed every 15 minutes, and the Plaintiff has not presented any evidence establishing that watching Tucker in the infirmary as opposed to in A-Pod was the moving force behind his death.  See Cagle, 334 F.3d at 989-90 (monitoring suicidal inmate every 15 minutes via closed circuit television was not unconstitutional).

[25]While the Plaintiff's expert witnesses testified at length as to the ideal treatment they believe Tucker should have received, none of them were able to testify that any of the Defendants' policies or practices directly led to Tucker's death.

that the Defendants should be held liable, despite the absence of any personal conduct. According to the Plaintiff, Ancata establishes that Dean's, LaTorre's, and Laxton's constitutional duties to provide medical treatment to Tucker are non-delegable; therefore they cannot hide behind the inapplicability of the doctrine of respondeat superior, and they are not absolved by contracting with PHS.  The Plaintiff's reliance on Ancata at the summary judgment stage is misplaced.  Ancata, which involved the much more lenient motion to dismiss standard,  held that government entities which contract with private corporations such as PHS remain liable under § 1983 only to the extent that any policies or customs of PHS create a constitutional deprivation.  769 F.2d at 705.  Ancata does not recreate a theory of respondeat superior or personal liability for any government entity, (or for PHS), outside of the traditional policy, practice or custom theory of liability.[26]  Thus, rather than support the Plaintiff's theory of liability, Ancata makes clear that the remaining Defendants and PHS can only be liable under § 1983 for their own actions, or for their own policies, practices and customs.  Id. at 706.

The Defendants are entitled to summary judgment on the § 1983 claims brought against them in their individual capacity.[27]

---

[26]See 769 F.2d at 705, n. 8 ("However, if a constitutional tort committed by an employee of Prison Health Services was not a result of the policy or custom of the entity, then the county would not be liable.  Liability for the independent actions of a health service employee would be based upon respondeat superior and thus not actionable against the county under § 1983.").

[27]This causal connection analysis also applies to the Plaintiff's claims against the Defendants in their official capacities.  Therefore, the Plaintiff's failure to establish a causal connection to support a theory of supervisory liability - i.e. the failure to demonstrate a custom,
(continued...)

*C.     Deliberate and Intentional Conduct*

Given the absence of any personal conduct on the Part of the Defendants, or a causal connection between the Defendants and any alleged unconstitutional conduct, the Court's analysis can end here.  However, in the event the Plaintiff was able to create an issue of fact with respect to either Laxton or PHS - the only two Defendants who arguably had any connection with Tucker - the Plaintiff's § 1983 claims against these Defendants would not be able to go forward due to the lack of any issue of material fact that these Defendants acted deliberately and intentionally to deprive Tucker of his constitutional rights.[28]

"[N]ot 'every claim by a prisoner that he has not received adequate medical treatment states a violation of [his constitutional rights].'" McElligott v. Foley, 182 F.3d 1248, 1254 (11th Cir. 1999) (quoting Estelle v. Gamble, 429 U.S. 97 (1976)).  Rather:

> a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment. . . . Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts

[27](...continued)
policy or practice depriving Tucker of his constitutional rights - is equally fatal to her official capacity claims, and the Court will grant summary judgment in favor of the Defendants on the § 1983 official capacity claims.  See e.g., McDowell v. Brown, 392 F.3d 1283, 1289-90 (11th Cir. 2004) (listing the elements of an official capacity claim, which require the showing of a "policy or custom which constituted deliberate indifference" to a constitutional right, and that a policy or custom is generally proven by establishing a "persistent and wide spread practice.").

[28]The Court finds that further analysis of the deliberate and/or intentional conduct prong is appropriate because it provides an alternative ground requiring summary judgment.

28

> or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

Estelle, 429 U.S. at 105-06.

"To show that a prison official acted with deliberate indifference to a prisoner's serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." Farrow v. West, 320 F.3d 1235, 1343 (11th Cir. 2003).  First, a plaintiff must present evidence of an objectively serious medical need.  Then the plaintiff must demonstrate that the officials acted with an attitude of "deliberate indifference" to that serious medical need. Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005).  "Deliberate indifference" itself has three separate components: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; [and (3)] conduct that is more than mere negligence."  McElligott, 182 F.3d at 1255.  A defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.

> i.    Deliberate Indifference to Suicide

The Plaintiff first alleges that the Defendants were indifferent to Tucker's mental illness and suicidal tendencies, which resulted in Tucker committing suicide by choking. To establish liability for a prisoner's suicide under § 1983, "the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's taking of his own life." Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir.2005) (quoting Cagle v. Sutherland, 334 F.3d 980, 986 (11th Cir.2003)) (internal quotation mark

omitted).  This "requires that the defendant deliberately disregard 'a strong likelihood rather than a mere possibility that the self-infliction of harm will occur.' "  Cook, 402 F.3d at 1115 (quoting Cagle, 334 F.3d at 986) (emphasis omitted).  "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners."  Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1540 (11th Cir.1994) (en banc).  "[T]he official must be subjectively aware that the combination of the prisoner's suicidal tendencies and the feasibility of suicide in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will commit suicide."  Gish v. Thomas, 516 F.3d 952, 954-55 (11th Cir. 2008).

The Plaintiff alleges that the Defendants are liable for Tucker's alleged suicide by choking because the Defendants were aware of and disregarded the strong likelihood that Tucker would kill himself based on his previous suicide attempts, his past history of mental illness, his threats to commit suicide, and his obviously delusional and aggressive behavior while at the Marion County Jail.  To be sure, these facts evidence a risk of serious harm and the Defendants do not appear to dispute that a "strong likelihood" existed that Tucker would try to commit suicide.  However, the Plaintiff has failed to establish a "strong likelihood" that Tucker would commit suicide specifically by choking on his lunch meal.

Initially, the Plaintiff has not presented any admissible evidence that Tucker did, in fact, commit suicide; the medical examiner determined that Tucker's death was accidental, and Plaintiff's own expert witnesses cannot agree as to whether this choking was

accidental or intentional.[29]  Moreover, there is no evidence that either Laxton or PHS - or even any of their officers or subordinates - were either subjectively or objectively aware that based on Tucker's mental condition, and given the context of his surroundings at the Jail, he would try to commit suicide by forced choking.  Stated differently, the Plaintiff has not presented any evidence or legal authority for the proposition that the Defendants were required to foresee that Tucker would kill himself by intentionally choking to death on his lunch meal.  See, e.g., Gish, 516 F.3d at 955 (finding that deputy sheriff was not deliberately indifferent where he was unaware that security screen in vehicle was unlocked, allowing pretrial detainee to reach in and grab loaded handgun to commit suicide); Cagle, 334 F.3d 980, 989-90 (11th Cir. 2003) (finding that jail officials were not deliberately indifferent where they had no knowledge that the decedent would hang himself with the elastic from his underwear); Hardin v. Hayes, 957 F.2d 845, 851 (11th Cir. 1992) (finding that prison officials "could not have known of the possibility that the Decedent might choke to death on a bar of soap.").

The undisputed facts also show that the Defendants - and PHS in particular - were not indifferent to Tucker's suicidal tendencies, but rather provided him with extensive medical treatment during his entire stay at the Marion County Jail.  Not only was he transported to the Monroe Regional Medical Center for examination two separate times,

---

[29]The Court is dubious about the expertise of anyone in the circumstances of this case to offer an opinion on this issue.  Tucker was suicidal and he choked to death on his food.  But it is entirely conjectural and speculative as to whether he intentionally choked or did so accidentally.

he was examined by the PHS psychiatrist on at least two occasions, diagnosed with probable personality disordere and paranoid schizophrenia, examined and treated by PHS physicians multiple times, and assessed by PHS psychiatric nurses daily.   More importantly, with the exception of one day several weeks before his death, Tucker was kept on suicide watch precautions for his entire detention, which included the removal of any implements that might assist suicide, and visual checks by corrections officers every 15 minutes.[30]   While the facts indicate that Tucker was a suicide risk, the actions taken by the Defendants clearly decreased the risk, and conclusively show a lack of deliberate indifference on the part of the Defendants and other Marion County Jail personnel.[31]   See Cagle, 334 F.3d at 989-90 (placing inmate on suicide watch, removing his belt, shoelaces, the contents of his pockets and any other implements that may be used to harm oneself, checking on the inmate every one hour and forty minutes, and monitoring him every 15

---

[30]The Plaintiff makes much out of the fact that she has only received copies of the observation logs for September 14th and 15th, but has not received the observation logs for the other times Tucker was on suicide watch in August 2002 and early September 2002.  The Court does not believe the absence of such records precludes the entry of summary judgment.  The Plaintiff has not presented any evidence to refute the fact that Tucker was visually checked every 15 minutes while on suicide watch, and does not make any real attempt to refute this fact.

[31]The Plaintiff also argues that the Defendants were deliberately indifferent in delaying access to psychiatrists and delaying "appropriate mental health treatment."  The undisputed facts belie that claim.  Tucker was seen by psychiatric nurses and a psychiatrist almost immediately upon his arrival at the Marion County Jail, and the Defendants made numerous attempts to secure an outside psychiatrist to further examine Tucker.  To the extent the Plaintiff is arguing that the Defendants were deliberately indifferent when they did not transfer Tucker to another mental health treatment center, the Plaintiff has not established that Tucker had a constitutional right to be transferred to such a center following his arrest.

minutes via closed circuit television "might be evidence of negligence, but could hardly demonstrate deliberate indifference.") (internal quotation and citation omitted).

The Plaintiff further contends that the Defendants prescribed the wrong anti-psychotic medications, failed to provide Tucker with constant supervision, and failed to provide Tucker with access to a psychiatrist on a more frequent basis, all of which led to Tucker's alleged suicide.  These claims do not rise to the level of deliberate indifference, and the Plaintiff has failed to present any legal authority to the contrary.  Instead, she appears to be making claims of missed diagnoses, incorrect medication choices, and failed treatment opportunities - *i.e.*, claims of medical malpractice and negligence.  Such claims do not exist under § 1983.[32]

### ii.   Deliberate Indifference to Swallowing

The Plaintiff also alleges that the Defendants knew that Tucker had difficulty swallowing, deliberately ignored this medical condition, and knowingly administered anti-psychotic medications with side effects that exacerbated Tucker's swallowing issues.  This

---

[32]The Plaintiff's own expert witness testified that the Defendants were not deliberately indifferent to Tucker's mental illness and/or suicidal tendencies, and that they provided "appropriate care."  Instead, he merely opined that the Defendants could have provided additional medical treatment.  See Deposition of Dr. Elias H. Sarkis, pps. 28, 42, 63, 99 (Doc. 124).  However, a "simple difference in medical opinion" does not constitute deliberate indifference.  Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir.1989).  "[T]he question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the [Fourteenth] Amendment."  Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir.1995) (citation omitted).

portion of the Plaintiff's claim fails because she has not established that any of the Defendants were subjectively aware of any serious medical need.

Other than a single complaint during his intake at the jail on August 11, 2002, at a time when Tucker was undisputably disoriented and unable to properly answer questions, there is no evidence that Tucker ever complained of any difficulties swallowing, that he had any problems swallowing his medications or eating his food throughout his entire detention, or that anyone at the Jail was aware that Tucker was experiencing difficulty swallowing. The medical records submitted to the Court also evidence a lack of any complaints or concerns about Tucker's ability to swallow and/or consume food.  Moreover, the Plaintiff has not presented any expert testimony establishing that Tucker did indeed suffer from any swallowing disorders, or that any of the Defendants should have been aware of any such issues.[33]  There is simply no evidence that anyone at the Marion County Jail was aware of any problems Tucker had swallowing and, if he had verbalized any complaints, the evidence is that he would have received treatment.  Thus, to the extent Tucker may have had difficulties swallowing, any such difficulties did not rise to the level of a serious medical need that is "so obvious that even a lay person would easily recognize the necessity for a

---

[33]Both parties have submitted conflicting expert testimony on the issue of whether or not Tucker suffered from any conditions that would result in difficulty swallowing.  The fact that the experts cannot agree on Tucker's condition merely strengthens the Court's decision that the Defendants could not have been subjectively aware of any serious medical needs with respect to Tucker's ability to swallow.  If anything, the expert testimony establishes that the Defendants - and PHS in particular - may have mis-diagnosed Tucker, which is more akin to a negligence or medical malpractice claim, not a claim of deliberate indifference.  See Waldrop, 871 F.2d at 1033.

doctor's attention." Farow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir.1994)). See also Britt v. Prison Health Services, Inc., Case No. 6:06-cv-599-Orl-19DAB; 2007 WL 2126294 (M.D. Fla. July 23, 2007) (granting summary judgment in favor of prison officials where there was no evidence they were subjectively aware of the severity of the prisoner's physical condition).

Because the Plaintiff cannot establish any personal involvement by any of the Defendants in Tucker's treatment (or alleged lack thereof), cannot establish any causal connection sufficient to create supervisory liability, and cannot establish that the Defendants acted deliberately or intentionally to deprive Tucker of medical treatment, summary judgment shall be granted in favor of the Defendants as to all § 1983 claims.[34]

III.     State Law Claims Under the Baker Act

The Plaintiff has also alleged that Defendants Dean, LaTorre, and Laxton each violated Tucker's rights and privileges as set forth in Florida's Baker Act when, after they obtained custody of Tucker from the Marion-Citrus Mental Health Center on August 10, 2002, they detained Tucker at the Marion County Jail instead of transferring him to another

---

[34]The Plaintiff's failure to establish that any of the remaining Defendants were deliberately indifferent to Tucker's allegedly serious medical needs, coupled with her inability to point to any legal authority establishing a right to be transferred to another facility, would also be sufficient to afford the Defendants the defense of qualified immunity. See, e.g. Belcher v. City of Foley, Alabama, 30 F.3d 1390 (11th Cir. 1994).

mental health facility for assessment and treatment.  <u>See</u> Fla.  Stat. §§ 394.459(1) and 394.463(2)(a)2.[35]

The Baker Act's obligations with respect to law enforcement officers are generally limited to the transportation of persons who are taken into custody under the Act to an appropriate receiving facility for examination.  <u>See</u> Fla. Stat. § 394.462(1).  Where a law enforcement officer takes custody of a person based on minor criminal behavior, the officer must immediately transport the person to the nearest receiving facility.  <u>See</u> Fla. Stat. § 394.462(1)(f).  Where the person is taken into custody and arrested for a felony, the law enforcement officer must first process the person as a criminal suspect, then immediately notify the nearest receiving facility to arrange for examination and treatment.  <u>See</u> Fla. Stat. § 394.462(1)(g).  If a person taken into custody has an emergency medical condition, law enforcement officers may first transport the person to a hospital for emergency medical treatment.  <u>See</u> Fla. Stat. § 394.462(1)(h).  Law enforcement officers also have the authority to take a person who appears to meet the criteria for involuntary examination into custody (but has not engaged in any criminal behavior) and deliver the person to the nearest receiving facility.  <u>See</u> Fla. Stat. § 394.462(2)(a)2.

Taking the evidence and undisputed facts in the light most favorable to the Plaintiff, it is clear that these obligations were met.  Tucker was initially taken into custody by Citrus

---

[35]The Plaintiff cannot base her claims on any alleged failure to provide Tucker with Baker Act mental health treatment while at the Marion County Jail because the Baker Act specifically exempts county jails from its examination and treatment requirements.  <u>See</u> Fla. Stat. § 394.455.

County Sheriff's Officers after those officers determined Tucker met the criteria for involuntary examination, and transported to the Marion-Citrus Mental Health Center for evaluation.  At some point, the Center released Tucker and placed him in the custody of the Marion County Sheriff's Office for detention on felony criminal charges.  At this point, Tucker's rights under the Baker Act were not violated; the procedures required by the Act were followed to the letter.

The Plaintiff contends, however, that after Tucker was removed from the Center and into the custody of the Marion County Jail as a pretrial detainee, Dean, LaTorre and Laxton had a *continuing obligation* for the entire five-weeks of Tucker's detention to locate *another* appropriate receiving facility and transport Tucker to such a facility for examination.[36] There is nothing in the Baker Act which creates such an obligation, and the Plaintiff has not pointed to any legal authority to support this novel claim, nor has she presented any evidence that any alternative receiving facilities even existed within Marion County at the time of Tucker's arrest.[37]  Rather, the Court's reading of the Baker Act is that once a patient is released or discharged from a receiving facility into the custody of law enforcement

---

[36]At the May 8, 2008 hearing, counsel for the Plaintiff argued that each time Tucker exhibited altered or delusional behavior during his stay at the Jail should have been considered a "new episode," which should have triggered a "new obligation" on the part of Dean, LaTorre and Laxton to transport Tucker to an appropriate receiving facility.  Regardless of whether the Plaintiff's couch their theory as a "continuing obligation" or multiple "new obligations" the result is the same - the Baker Act does not require law enforcement officers to engage in the conduct the Plaintiff desires, and there is admittedly no legal support for the Plaintiff's position.

[37]The Plaintiff has presented very limited evidence that another receiving facility existed in Alachua County.  However, the Plaintiff has not submitted any evidence establishing the authority of the Defendants to transfer Tucker to a facility outside their legal jurisdiction.

based on felony criminal charges, the only obligations of *law enforcement* are to process the person and/or detain him in accordance with the appropriate criminal laws and procedures.[38]  There can be no dispute that these Defendants did exactly what they were required to do.

Summary judgment in favor of Defendants Dean, LaTorre and Laxton is appropriate as to the Plaintiff's Baker Act claims.

IV.   State Common Law Claims Against Dean

Counts V-VII of the Plaintiff's Second Amended Complaint allege common law claims of negligence, wrongful death, and a survival claim against Defendant Dean.  In particular, the Plaintiff alleges that Dean had a common law duty to secure proper care for Tucker's mental illness and breached that duty of care by: (a) jailing him and refusing to provide proper and reasonable care; (b) using pepper spray, stun guns, and other restraints on Tucker; (c) subjecting Tucker to medication that contributed to his mental instability; (d) leaving Tucker without proper attention and refusing to provide him with a suicide watch; (e) allowing Tucker to be subjected to taunting, demeaning, and humiliating

---

[38]See, e.g. Fla. Stat. § 394.463(i)1 (after the conclusion of the 72-hour involuntary examination period, the patient must be released, "unless he or she is charged with a crime, in which case the patient shall be returned to the custody of a law enforcement officer."); Fla. Stat. § 394.462(1)(g) (when a receiving facility determines that it does not have adequate security to hold a person charged with a crime, the *receiving facility* will provide treatment at the location where the person is held).  There are no allegations that these Defendants impeded any receiving facility from providing Tucker treatment.  In addition, Florida statutes provide a separate mechanism for having a detainee or inmate who is found to be mentally ill involuntarily committed for examination and treatment.  Such procedures require a hearing and court order.  See Fla. Stat. § 394.467.  The Plaintiff has never alleged that these procedures apply or were violated in this case.

actions from staff and other inmates; and (f) denying Tucker access to his family as well as to a competent, independent psychiatrist.[39]   The Plaintiff further alleges that these enumerated breaches both caused Tucker's death, and caused Tucker numerous injuries throughout his detention that are unrelated to his death.

Because the Plaintiff has not alleged or presented any facts establishing that Dean "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property," these claims can only be brought against Dean in his official capacity.  See Fla. Stat. § 768.28(9)(a).  And, because it is undisputed that Dean himself never personally participated in any of these alleged breaches, he can only be held liable under a theory of vicarious liability.[40]

"It is long established that, under Florida law, corrections officers owe individuals within their custody a duty to use reasonable care for their safety."  Cook, 402 F.3d at 1119.  It is equally undisputed that the sheriff, as "an official of a political subdivision," is liable under Florida law for a wrongful act or omission of any employee of the agency while acting within the scope of his office or employment.  See Fla. Stat. § 768.28; Dep't of Health & Rehabilitative Servs. v. McDougall, 359 So. 2d 528, 532 (Fla. Dist. Ct. App. 1978).  Thus, when the actions or omissions of a corrections officer result in injury to an inmate

---

[39]Second Amended Complaint, ¶¶ 66-67.

[40]The Plaintiff appears to agree on this point, as she states in her response in opposition that she has asserted a state law claim "against Marion County Sheriff's Office for negligence pursuant to Chapter 768, Florida Statutes."  See Doc. 147, p. 5.  The Marion County Sheriff's Office is not a party to this suit; thus the only way to seek liability against the agency itself is to sue Sheriff Dean, the head of that agency, in his official capacity.

within the officer's custody, the sheriff may be liable in negligence for the harm suffered by the inmate.  Cook, 402 F.3d at 1119.

Dean argues that he is entitled to summary judgment on these claims because the undisputed facts demonstrate that he was not negligent and that he did not breach any of his duties towards Tucker.  It is clear to the Court that the only way to resolve these claims would be to engage in fact finding and credibility determinations.  Both sides have several expert witnesses and a multitude of lay witnesses who are prepared to testify at trial as to whether or not Tucker received reasonable care.  It is for the jury to weigh each witnesses' testimony and to resolve the fact issues in these claims.  Therefore, summary judgment on the negligence, wrongful death, and survival claims against Defendant Dean will be denied.

These three state law claims will go forward on the very limited bases set forth in the Plaintiff's Second Amended Complaint.  Namely, whether Sheriff Dean breached his duty of care by: (a) failing to provide proper and reasonable mental and psychiatric care; (b) using pepper spray, stun guns, and other restraints on Tucker that were not necessary under the circumstances; (c) subjecting Tucker to medication that contributed to his mental instability; (d) leaving Tucker without proper attention and refusing to provide him with a suicide watch; (e) allowing Tucker to be subjected to taunting, demeaning, and humiliating actions from staff and other inmates; (f) denying Tucker access to his family as well as to a competent, independent psychiatrist; and (g) whether these breaches caused Tucker's death or any other injuries to Tucker while he was detained at the Marion County Jail.  The

40

Plaintiff may not litigate these claims under a theory of medical malpractice, nor may she seek to relitigate the dismissed federal tort claims alleging deliberate indifference.

V.    Request for Injunctive/Declaratory Relief

In her prayer for relief in the Second Amended Complaint, the Plaintiff seeks declaratory and injunctive relief declaring illegal and enjoining, preliminarily and permanently the Defendants' alleged policies, practices, and customs of: (1) "jailing Baker Act patients and denying them access to proper mental health treatment;" (2) "allowing patients in Jail to be subjected to the forced invasion of their bodies, administration of psychiatric medications in a manner inconsistent with Federal and Florida law;" and (3) "failing to promptly transfer mentally ill patients believed to be a danger to themselves or others to proper facilities where treatment will be expeditiously and properly provided."[41] The Plaintiff does not specify whether she is seeking such relief as part of her federal or state law claims.  Nevertheless, the Plaintiff's request for injunctive and declaratory relief fails both because she has been unable to establish the existence of any such policies, practices, or customs, and because the Court has previously determined that summary judgment is appropriate in favor of the Defendants as to both the 42 U.S.C. § 1983 claims and the Baker Act claims.  Moreover, to the extent the Plaintiff's prayer for relief can be considered a separate cause of action, it cannot go forward because she cannot show that she has or will suffer an irreparable injury that cannot be cured by monetary damages.

---

[41]Doc. 50, p. 29, ¶¶ A-C.

See Weekley v. Pace Assembly Ministries, Inc., 671 So. 2d 220 (Fla. 1st Dist. Ct. App. 1996) (setting forth the elements for injunctive relief).[42]

Summary judgment shall be granted in favor of the Defendants as to the Plaintiff's request for declaratory and injunctive relief.

## CONCLUSION

Accordingly, upon due consideration, it is hereby ORDERED AND ADJUDGED that:

(1)     Defendants Ed Dean's, Fred LaTorre's and Paul Laxton's Motion for Summary Judgment, (Doc. 116), is GRANTED IN PART AND DENIED IN PART.   Summary judgment is granted in favor of Defendants Dean, LaTorre and Laxton and against the Plaintiff as to the Plaintiff's claims in her Second Amended Complaint brought under 42 U.S.C. § 1983, (Counts III, X-XI), and as to the claims brought under the Baker Act, (Counts IV, VIII-IX).   Summary judgment is also granted in favor of Dean, LaTorre and Laxton, and against the Plaintiff as to the Plaintiff's request for declaratory and injunctive relief.   In all other respects, the Motion for Summary Judgment, (Doc. 116), is DENIED;

---

[42]The Plaintiff has apparently abandoned her request for injunctive relief, as she has not responded to this portion of Defendants Dean, LaTorre, and Laxton's motion for summary judgment.   The only allegations of future injury are found in the Second Amended Complaint, which states that Tucker's surviving mother and sisters, as well as mentally ill persons not yet arrested in Marion County, are at risk of being subject to future violations of their rights.   Doc. 50, ¶ 42.   This allegation of potential harm is far too speculative to form the basis of injunctive relief. See City of Los Angeles v. Lyons, 461 U.S. 95 (1983); Church v. City of Huntsville, 30 F. 3d 1332 (11th Cir. 1994).

(2)     Defendant Prison Health Services' Motion for Summary Judgment, (Doc. 119), is GRANTED.  The Clerk is directed to enter judgment in favor of Prison Health Services and against the Plaintiff as to all claims alleged against Prison Health Services in the Second Amended Complaint (Count XIV);

(3)     Plaintiff Cindy McGough's Motion for Partial Summary Judgment, (Doc. 118), is DENIED;

(4)     Pursuant to the Plaintiff's Stipulations, (Docs. 113, 115, 117), the Clerk is directed to enter judgment dismissing without prejudice all claims against Defendants Marion County (Counts I-II), Kevin Dahmen (Counts XII-XIII), Johnnie Gallemore (Count XV), Denise Fox (Count XVI), Dana Ewell (Count XVII), Anteneh Addisu (Count XVIII), Aaron Scroggins (Count IXX), and Albert Willison (Count XX);

(5)     The Defendants' Motions to Dismiss, (Docs. 44-46, 52-53, 57, 61, 89-90, and 107) are DENIED AS MOOT;

(6)     The Clerk is directed to enter judgment in favor of Defendants LaTorre and Laxton and against the Plaintiff as to Counts VIII-XI.  The Clerk is further directed to withhold the entry of final judgment as to Sheriff Dean pending resolution of the remaining state law claims (Counts V-VII);

(7)     The Plaintiff's Motion for Continuance, (Doc. 169), is DENIED AS MOOT; and

(8)     A supplemental pretrial conference shall be scheduled by separate notice for June 18, 2008, and this case shall be set for trial during the term commencing June 30,

2008.  The Parties are directed to file an amended pretrial statement within the time limits

set forth in Local Rule 3.06(c).

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 14th day of May, 2008.

_____

UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record